# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 3, 2014 Session

## STATE OF TENNESSEE v. JUNE LOUDERMILK

**Appeal from the Criminal Court for Shelby County**
**No. 12-00078    W. Mark Ward, Judge**

---

**No. W2013-01613-CCA-R3-CD - Filed August 6, 2014**

---

June Loudermilk ("the Defendant") was convicted by a jury of driving under the influence ("DUI"), fourth offense.  After a hearing, the trial court sentenced the Defendant to two years in the workhouse, suspended to supervised probation after seven months in confinement.  In this direct appeal, the Defendant attacks the validity of his indictment and also contends that the trial court's jury charge was so defective as to entitle him to a reversal of the jury's determination that he was a multiple DUI offender.  Upon our thorough review of the record and applicable law, we modify the trial court's judgment of conviction and remand this matter for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Modified; Remanded**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Walter Bailey and Taurus Bailey (at trial and on appeal), and Claiborne H. Ferguson (on appeal), Memphis, Tennessee, for the appellant, June Loudermilk.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Michael McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with DUI, fourth offense, allegedly committed on May 6, 2011.  At the Defendant's ensuing jury trial, conducted in April 2013, the following proof was adduced:

Officer Jonathan Chalk of the Memphis Police Department ("MPD") testified that, at about 3:00 a.m. on May 6, 2011, as he was walking back to his squad car after responding to a call, he heard "a car peel out of the intersection." When he looked to see the source of the noise, he saw "an older model Chrysler go through the intersection." Officer Chalk decided to follow the Chrysler. He testified that, as they were traveling eastbound, the Chrysler "began to swerve into the westbound lane of traffic." Officer Chalk observed the Chrysler weave in this manner "[a]t least three or four" times, and he decided to pull the car over. After the Chrysler pulled over, Officer Chalk approached the driver and requested his license. Officer Chalk saw a can of Budweiser in the back seat.

According to Officer Chalk, who identified the Defendant as the driver, the Defendant "was very talkative, belligerent. He had a slow reaction getting his license for me. I could smell alcohol. His eyes looked bloodshot, watery. And his speech, it was mumbled." Officer Chalk "came to the conclusion that [the Defendant] was drunk." Accordingly, Officer Chalk took the Defendant into custody and placed him in the back of the squad car. The Defendant continued to be belligerent and argumentative. Officer Chalk requested a DUI officer to come and have the Defendant perform field sobriety tests.

The DUI officer arrived about twenty minutes later. Officer Chalk observed the Defendant as he tried to perform the walk-and-turn test, and he testified that the Defendant had difficulty following the instructions and continued to be argumentative. The Defendant refused to perform the one-leg stand test.

On cross-examination, Officer Chalk testified that he did not tell the Defendant that he was under arrest.

Officer Lionel Brown of the MPD testified that he worked in the DUI unit of the police department. For this assignment, he had completed a week of training in DUI-related matters including field sobriety tests and the use of an Intoximeter. He also received periodic updates to his training. He responded to DUI arrests in order to conduct field sobriety tests.

Officer Brown recalled responding to the Defendant's stop. When he asked the Defendant if he had any medical conditions that would prevent him from performing the walk-and-turn test, the Defendant told him that he had "back problems." Nevertheless, the Defendant told Officer Brown that he was willing to try to complete the test. Officer Brown testified that his squad car video-recorded the Defendant's attempt to perform the field sobriety test, and the recording was admitted into evidence and played for the jury.

Officer Brown testified that, as he watched the Defendant attempt to perform the walk-and-turn test, he concluded that the Defendant was "impaired and can't follow

directions." He also testified that he smelled "a little bit of alcohol" about the Defendant. Officer Brown also asked the Defendant to perform the one-leg-stand field sobriety test. The video-recording, which this Court has watched, shows the Defendant refusing to attempt this test. The Defendant then was handcuffed and placed in the back of a patrol car. The Defendant refused to give a blood sample or blow into the Intoximeter. Asked what his conclusion was about the Defendant's condition based on his investigation, Officer Brown testified, "He was drunk."

On cross-examination, Officer Brown stated that the Defendant was already under arrest for DUI when he arrived on the scene. Officer Brown conducted the field sobriety tests in order to collect additional evidence.

The Defendant testified that he lived with his parents at the time of the stop. He was a commercial driver with a "Class A" license with "triple endorsements." On the day before the stop, he had driven about sixteen hours. He got home at about 6:30 or 7:00 p.m. on May 5, 2011. He watched television, trying to sleep. He explained that, when he was awake for that long, sometimes he "hit a second wind" and could not sleep. Between 7:30 and 11:00 p.m., the Defendant had "two small shots." Shortly after 11:00 p.m., he went to sleep.

At about 2:30 a.m. on May 6, 2011, the Defendant got up to go to the bathroom, and he saw his mother and father in the living room. His father was coughing and his mother "was looking pretty concerned." His parents had called the doctor, and the doctor had called in a prescription. His mother asked him to pick up the prescription, and he agreed to do so. His mother told him that he could take her car, and he did. On his way to the drug store ("the Walgreens"), he swerved twice, once to avoid a hole in the road and once to avoid some tree limbs in the road. He was pulled over after the second swerve, and he parked his car in a gas station parking lot. When Officer Chalk approached his car, he handed over his driver's license and proof of insurance. Officer Chalk took these documents to his patrol car and, after approximately five minutes, returned to the Defendant and ordered the Defendant out of the car. Officer Chalk handcuffed the Defendant and placed him in the back of Officer Chalk's patrol car. Officer Chalk "didn't tell [him] anything."

The Defendant waited in the back of the patrol car with "no idea what was going on at that point." When "the whiskey unit" arrived, he was taken out of the car. The Defendant realized that he was going to be asked to perform field sobriety tests, and he kicked off his flip-flops. Asked why he removed his flip-flops, the Defendant replied, "Because that crack was about that wide in some places and I knew flip flops, you can't hardly do a heel toe in flip flops anyway. You going to do it in a crack?"

The Defendant testified that Officer Brown's instructions about walking the white line were "pretty confusing." He added that he "was trying to get it over with because dad

is home sick, got to go." He testified that he had sustained injuries to his back while he was a paratrooper in the military. He also broke a hip in a motor vehicle accident in 2003. While he was standing in place listening to Officer Brown, his back was hurting. Asked whether he was impaired, the Defendant answered:

> I didn't feel impaired. I just felt like I wasn't being given the tests in a fair manner because I would they [sic] think they would give you a chance to pass or fail but this – they were giving the tests in such a manner I got the impression I was being made to fail because who can walk in a freaking crack? I mean, crap, and then I'm staring in the headlights and who can stare in the headlights and follow a finger, but I was doing my best.[1]

(Footnote added).

The Defendant acknowledged that, after he was handcuffed and placed in the patrol car following the field sobriety tests, he became "quite belligerent."[2] The Defendant explained:

> Well, I had been awake, except for that nap, about twenty-six hours at that point, and I'm thinking about my dad suffering, and these guys are messing with me, and I'm under the impression that the officer's giving the test in an unfair manner where I can't pass it. I told him that I wasn't going to do the Breathalyzer, I wanted a blood test, and he ignored that. He had been ignoring all the things I had been telling him about my health condition. And then we get in the car and I find out I've been under arrest before he ever showed up. Nobody bothered to tell me I was under arrest. Because if I'm under arrest, I have rights at that point. But they had ignored to tell me that, trying to pile on – if they had told me I was under arrest before the whiskey unit guy got there, I would have said, let's go ahead and go downtown, because I'm not going to do anything else and I would have the right to refuse, but they didn't tell me that.

The Defendant explained that he became outraged and belligerent because the officers were "trying to take [his] freaking living away from [him]." The Defendant continued:

_____

[1] The video-recording reflected Officer Brown telling the Defendant to follow Officer Brown's finger with his eyes and without turning his head while standing still.

[2] The video-recording reflected the Defendant yelling and cursing at Officer Brown as Officer Brown tried to read the implied consent form to the Defendant.

Because I lose my license, I'm out of work. In this economy, I was fifty-four. What am I going to do? It's going to take me years to learn something else to make that kind of money. I'm going to be broke, flipping burgers. At fifty-five, fifty-six. Going to take me three or four years to get a freaking decent paying job, learn a skill. Start over again, and I was thinking about all the money they was [sic] going to be taking out of me. I like my job, I like traveling. And they're taking it away from me and they're not even informing me of my rights.

That's when I went off the hook. And while we're on that subject, I had no right to say that to that officer, especially to his mother. When I saw myself yesterday for the first time, I seen that in public, and I was ashamed. I'm sorry. I don't know where that came from and I don't need to ever go there again.

I lost it. I was PO'd beyond belief when I found out that – I was not told I was under arrest and they didn't – because I could have just exercised my rights at that point, but they didn't inform me. And Officer Brown knew I was under arrest but he was still putting me through the tests, and so that really set me off.

I was infuriated, yes. Lucky for me being a loud-mouthed A-hole isn't illegal or I would have been put away a long time ago, I guess. Because that's what I was being.

The Defendant testified that, at the time, he was sober but very tired.

On cross-examination, the Defendant admitted that the video-recording did not reflect him telling Officer Brown that he wanted a blood test. He reiterated that his destination had been a pharmacy where his father's prescription had been called in.

Effie Loudermilk, the Defendant's mother, testified that, on the night in question, her husband had started coughing at about 9:00 or 10:00 p.m. She asked the Defendant to go get the cough medicine at approximately 2:00 a.m. She told the Defendant to take her car. She confirmed the Defendant's past injuries.

On cross-examination, Mrs. Loudermilk stated that she did not smell alcohol on the Defendant's breath that night.

J. A. Loudermilk, the Defendant's father, testified that he had been driving the Chrysler earlier in the day on May 5, 2011. He had been working around sawdust and had

gotten choked up. He decided to drink a beer after he got home in order to clear his chest. He threw the beer can in the back seat of the Chrysler after he finished drinking it. Later that night, he began coughing. At about 2:00 or 2:30 a.m., his wife asked the Defendant to go out and get him some cough medicine.

Lisa Anthony, called by the State in rebuttal, testified that she worked at the Walgreens as store manager and had worked there since 2007. She stated that the Walgreens never had been a twenty-four hour operation. She testified that it was open from 8:00 a.m. to 10:00 p.m. on Monday through Friday, 9:00 a.m. to 6:00 p.m. on Saturdays, and 10:00 a.m. to 6:00 p.m. on Sundays.

On cross-examination, Anthony explained that, when a prescription was called in while the Walgreen's was closed, it would be filled when the pharmacist came in.

On the basis of this proof, the jury convicted the Defendant of DUI. The trial court then permitted the State to adduce the following proof about the Defendant's status as a multiple DUI offender:

Gail Rankins testified that she worked in the Criminal Court Clerk's Office of Shelby County. She testified that the Defendant had been indicted in case number 02-05600 for driving under the influence. The date of arrest was July 22, 2001, and the disposition date was March 3, 2003. The Defendant was convicted of DUI. The Defendant previously had been indicted in case number 94-02332 for DUI and reckless driving. The date of arrest was October 2, 1993. On the basis of this indictment, the Defendant was convicted of DUI on February 22, 1995.

Sharon Baker testified that she worked for the General Sessions Criminal Court and that the Defendant was convicted of DUI on November 30, 1992.

On the basis of this proof, the jury found the Defendant guilty "of a fourth or subsequent offense of" DUI. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to two years in the workhouse, to be served on supervised probation after seven months of confinement. In this direct appeal, the Defendant contends that that portion of the indictment charging him with fourth offense DUI is fatally defective and that the trial court erred in its charge to the jury, entitling him to a reversal of the jury's verdict that he is a multiple DUI offender. We will address each of these issues in turn.

## Analysis

*Indictment*

The indictment in this case charged in pertinent part as follows:

[The Defendant] on May 6, 2011 in Shelby County, Tennessee, and before the finding of this indictment, had been *convicted* of three (3) prior offense(s) of driving a motor vehicle upon a public highway while under the influence of an intoxicant, to wit:

1. On March 25, 2003 in the Criminal Court of Shelby County, Tennessee said case bearing court docket number 02-05600;

2. On February 27, 1995 in the Criminal Court of Shelby County, Tennessee said case bearing court docket number 94-02332;

3. On November 30, 1992 in the General Sessions Court of Shelby County, Tennessee said case bearing court docket number 92306027;

and by reason of *said prior convictions*, has become subject to the enhanced punishment provisions as a felony for the said offense, all of which is against the peace and dignity of the State of Tennessee.

(Emphases added). The Defendant contends that this portion of the indictment is fatally defective because it refers to conviction dates instead of violation dates.

As the Defendant points out, in May 2011, the pertinent statute provided as follows:

[A] person who is convicted of a violation of § 55-10-401 shall not be considered a repeat or multiple offender and subject to the penalties prescribed in this subsection (a) if ten (10) or more years have elapsed between the date of the present *violation* and the date of any immediately preceding *violation* of § 55-10-401 that resulted in a conviction for such offense. If, however, the date of a person's *violation* of § 55-10-401 is within ten (10) years of the date of the present *violation*, then the person shall be considered a multiple offender and is subject to the penalties imposed upon multiple offenders by the provisions of this subsection (a). If a person is considered a multiple offender under this subdivision (a)(3), then every *violation* of § 55-10-401 that resulted in a conviction for such offense occurring within ten (10) years of the date of the immediately preceding

-7-

*violation* shall be considered in determining the number of prior offenses. However, a *violation* occurring more than twenty (20) years from the date of the instant *violation* shall never be considered a prior offense for that purpose.

Tenn. Code Ann. § 55-10-403(a)(3) (Supp. 2010) ("section (a)(3)") (emphases added). The State argues that this issue is waived because the Defendant did not file a pre-trial motion attacking the indictment.

Tennessee Rule of Criminal Procedure 12 provides that "[t]he following must be raised before trial: . . . a motion alleging a defect in the indictment, presentment, or information – but at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense[.]" Tenn. R. Crim. P. 12(b)(2)(B). The Defendant has alleged that the instant indictment did not "furnish the trial court an adequate basis for entry of a proper judgment."[3] However, the Defendant did not raise this issue either before trial or in the motion for new trial. Accordingly, this issue is waived. See Tenn. R. Crim. P. 12(f)(1).

Moreover, we hold that this issue is without merit. An indictment passes constitutional muster when it provides (1) notice of the charge against which the accused must defend himself; (2) an adequate basis for the entry of a proper judgment; and (3) protection of the accused from double jeopardy. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). The second requirement, targeted by the Defendant, looks simply to whether the indictment informs the trial court as "to what offense it must apply the judgment." State v. Griffis, 964 S.W.2d 577, 591 (Tenn. Crim. App. 1997) (quoting State v. Tate, 912 S.W.2d 785, 789 (Tenn. Crim. App. 1995)).

Additionally, an indictment satisfies statutory requirements when it

state[s] the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

Tenn. Code Ann. § 40-13-202 (2006).

---

[3] The Defendant also vaguely asserts that the indictment "fails to even allege a violation of the laws of Tennessee." We disagree. The indictment plainly alleges that the Defendant is a multiple DUI offender because prior convictions necessarily imply prior violations.

The indictment in this case charged the Defendant with being a multiple DUI offender and it informed the trial court that, upon sufficient proof and a verdict, it was to impose a judgment of a multiple DUI offense. The indictment referred to prior convictions instead of prior violations, but a prior conviction necessarily implies a prior violation. The Defendant himself knew the dates of the violations that resulted in the referenced convictions. Thus, the Defendant was able to discern for himself whether the prior convictions referenced in the indictment represented prior violations that were within the statutory reach-back periods and therefore available for the imposition of an enhanced sentence. We hold that the indictment in this case did not mislead the Defendant and that it passed constitutional and statutory muster. Accordingly, the Defendant is entitled to no relief on this basis.

*Jury Instructions*

When the jury returns a verdict of guilty on a DUI charge, and the indictment alleges that the defendant committed prior DUI offenses, "the jury, not the trial judge, must determine whether the defendant is a second or subsequent offender." State v. Sanders, 735 S.W.2d 856, 858 (Tenn. Crim. App. 1987). As set forth above, the relevant statute defining a multiple DUI offender focuses on the dates of the offender's previous *violations*, not the dates on which the offender was convicted for those violations. However, in this case, the trial court instructed the jury as follows regarding its decision of whether the Defendant was a multiple DUI offender:

> Members of the jury, you have determined that the defendant is guilty of driving under the influence of an intoxicant as charged in the indictment.
>
> It will now be your duty to determine whether or not the defendant has previously been *convicted* of such offense.
>
> The statutory law of this state provides that when a person is convicted of a fourth or subsequent offense of driving under the influence of an intoxicant, then the punishment is enhanced or increased.
>
> The indictment in this case alleges that the defendant has three prior *convictions* for driving under the influence, alleging further that this present *conviction* which you have previously returned is a fourth *conviction*.
>
> You will first determine whether or not and how many times the defendant has been previously *convicted* of driving under the influence of an intoxicant beyond a reasonable doubt.

-9-

Your verdict must be unanimous. Each juror must agree to any verdict.

Any record of prior convictions of the defendant is evidence which you may consider.

. . . .

Verdict choices. Choose one based upon the number of prior *convictions*.

If you find beyond a reasonable doubt that the *conviction* is – that the *conviction* as set in your previous verdict is a second *conviction*, then your verdict will be:

We, the jury, find the defendant guilty of second offense of driving under the influence of an intoxicant as charged in the indictment.

If you find beyond a reasonable doubt that the *conviction* as set in your previous verdict is a third *conviction*, then your verdict will be:

We, the jury, find the defendant guilty of a third offense of driving under the influence of an intoxicant as charged in the indictment.

If you find beyond a reasonable doubt that the *conviction* as set in your previous verdict is a fourth or subsequent *conviction*, then your verdict will be:

We, the jury, find the defendant guilty of a fourth or subsequent offense of driving under the influence of an intoxicant as charged in the indictment.

If however you find that the defendant has not been previously *convicted* of driving under the influence of an intoxicant or if you have a reasonable doubt thereof, then your verdict will be:

We, the jury, find the defendant not guilty of second or subsequent offense of driving under the influence of an intoxicant as alleged in the indictment.

(Emphases added).

The Defendant argues that this jury instruction was defective in two regards. First, it referred to prior convictions instead of prior violations. Second, it provided no information about the ten-year "reach-back" period quoted above. We will consider each of these alleged deficiencies in turn.

Initially, we agree with the Defendant that the trial court erred by instructing the jury to consider only the Defendant's prior *convictions* without also considering the dates of his prior *violations* that resulted in the convictions. However, we disagree that this error entitles the Defendant to relief. A conviction necessarily implies a violation. Indeed, the method by which the State proves a prior violation is by proving a prior conviction. The only legal significance attached to the *violation*, as opposed to the resulting conviction, is the date upon which the former took place. A defendant convicted of DUI can be punished as a multiple DUI offender only if his or her most recent prior DUI was committed within ten years of the date on which the instant offense was committed. See Tenn. Code Ann. § 55-10-403(a)(3).

As our supreme court has recognized,

> The law is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury upon proper instructions. The law requires that all of the elements of each offense be described and defined in connection with that offense. An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.

State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (internal quotation marks and citations omitted). When the trial court misstates the elements of an offense in its charge to the jury, the error "is subject to constitutional harmless error analysis." Id. at 60 (citing Pope v. Illinois, 481 U.S. 497, 501-03 (1987)). Under a constitutional harmless error analysis, the Defendant will not be entitled to relief if the record establishes that the trial court's instructional error was harmless beyond a reasonable doubt. See State v. White, 362 S.W.3d 559, 580 n.20 (Tenn. 2012) ("Because we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error, we cannot find the error harmless.").

In this case, the State adduced uncontroverted proof that the Defendant's most recent prior DUI conviction was imposed on March 3, 2003, and that this conviction resulted from the Defendant's violation of the DUI laws on July 22, 2001. The State also adduced uncontroverted proof that the Defendant's next most recent DUI conviction was imposed on February 22, 1995, and that this conviction resulted from the Defendant's violation of the DUI laws on October 2, 1993. Finally, the State also adduced uncontroverted proof that

the Defendant was previously convicted of DUI on November 30, 1992. However, the State failed to adduce any proof about the date on which the Defendant committed this offense.

By convicting the Defendant of DUI, fourth offense, the jury obviously accredited the State's uncontroverted proof on these points. We hold that the trial court's instructional error was harmless beyond a reasonable doubt as to the jury's determinations that the Defendant committed prior DUI violations on July 22, 2001, and on October 2, 1993. The jury, however, did not have before it sufficient proof from which to determine when the Defendant committed the DUI violation that resulted in his 1992 conviction. Accordingly, we hold that the trial court's error in instructing the jury about the Defendant's prior convictions instead of the Defendant's prior violations was not harmless beyond a reasonable doubt as to the jury's determination that the Defendant had committed a third prior DUI violation. Consequently, we are constrained to modify the Defendant's instant conviction to DUI, third offense.

As to the second alleged instructional error, that the trial court failed to charge the jury about the ten-year "reach-back" period, we hold that the reach-back period referred to in section (a)(3) operates, in effect, as a statute of limitations. See, e.g., State v. McKinney, 929 S.W.2d 404, 406 (Tenn. Crim. App. 1996) (applying, by analogy, tolling statute to defeat defendant's claim that his prior DUI conviction was outside the reach-back period where delay in conviction resulted from defendant absenting himself from jurisdiction). Where, as in this case, the proof of the relevant dates is uncontroverted, the trial court may determine as a matter of law whether the violations occurred during the relevant reach-back periods. See, e.g., State v. Vickers, 970 S.W.2d 444, 447 (Tenn. 1998) (recognizing that a trial court may resolve a statute of limitations issue before trial "if the issue revolves solely around the date a particular offense occurred"). Accordingly, we hold that the trial court did not commit reversible error in failing to charge the jury about the reach-back periods.

In this case, the jury determined that the Defendant had committed a prior DUI violation on July 22, 2001. This violation was well within the ten-year period preceding the Defendant's instant violation on May 6, 2011. The jury also determined that the Defendant had committed a prior DUI violation on October 2, 1993. This violation was well within the ten-year reach-back period preceding the July 22, 2001 violation. The jury's determination that the Defendant had committed a third prior violation was not supported by sufficient proof. Therefore, the trial court should have imposed a conviction of DUI, third offense, based on the jury's supported findings of fact as applied to section (a)(3).

## Conclusion

-12-

For the reasons set forth above, we modify the Defendant's conviction to DUI, third offense.  Further, we remand this matter for resentencing on the Defendant's modified conviction.

_____
JEFFREY S. BIVINS, SPECIAL JUDGE